UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Nicole Martinson,　　　　　　　　　　　　　　File No. 18-cv-03001 (ECT/LIB)

　　　　Plaintiff,

v.　　　　　　　　　　　　　　　　　　　　　**MEMORANDUM OPINION
　　　　　　　　　　　　　　　　　　　　　　AND ORDER**

Mahube-Otwa Community Action
Partnership, Inc.,

　　　　Defendant.

---

David E. Schlesinger and Laura A. Farley, Nichols Kaster, PLLP, for plaintiff Nicole Martinson.

Ruvin S. Jayasuriya, Ellen A. Brinkman, and David A. Schooler, Briggs & Morgan, P.A., for defendant Mahube-Otwa Community Action Partnership, Inc.

---

　　　　Plaintiff Nicole Martinson ("Martinson") asserts a single claim alleging that Defendant Mahube-Otwa Community Action Partnership, Inc. ("Mahube") terminated her employment in violation of the Minnesota Whistleblower Act, Minn. Stat. § 181.931–.935. To summarize, Mahube operates a Head Start program, among other services. Mahube hired Martinson to manage enrollment for this program. Martinson alleges that her supervisor instructed her to enroll applicants in the program who Martinson believed were ineligible under federal law. Martinson claims she then reported "violations or perceived violations" of a federal regulation governing the Head Start program to Mahube and that Mahube terminated her employment in retaliation for her reports. Martinson commenced this action originally in Minnesota state district court. Martinson asserts no claim created

by federal law, and there is no assertion that the parties are of diverse citizenship. Mahube removed the case to federal court asserting that Martinson's claim "turns on an embedded, substantial question of federal law which [Defendant is] entitled to litigate in a federal forum." Following removal, Martinson moved to remand for lack of subject-matter jurisdiction, and Mahube moved to dismiss the suit for failure to state a claim upon which relief may be granted.

Federal district courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. "[T]he vast bulk of suits that arise under federal law" assert a claim (or claims) created by federal law. *Gunn v. Minton*, 568 U.S. 251, 257 (2013) (citation omitted). A category of cases asserting a state-created claim nonetheless arise under federal law for purposes of § 1331 "if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258. This category is "special and small." *Id.* (quoting *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 699 (2006)). Martinson's complaint does not satisfy this test. Regardless of whether Martinson's claim necessarily raises a federal issue that is actually disputed, the federal issue is neither substantial in the jurisdictional sense nor capable of resolution in federal court without causing serious disruption to the federal-state balance approved by Congress. Martinson's motion to remand will be granted, and Mahube's motion to dismiss will be denied as moot.

I

"Mahube is a Minnesota nonprofit corporation providing services to low income and elderly persons living in Mahnomen, Hubbard, Becker, Otter Tail and Wadena counties in northwestern Minnesota." Notice of Removal ¶ 3 [ECF No. 1]; *see also* Am. Compl. ¶ 2 [ECF No. 14]. Among other services, "Mahube offers a Head Start program. Head Start is a federally-funded program which promotes the school readiness of young children from low-income families through agencies in their local communities." Notice of Removal ¶ 4. Mahube describes that its "Head Start program assists enrollees with education and school readiness, family support, health and nutrition, mental health, self-sufficiency and self-esteem, and positive discipline." *Id.*; *see also* Am. Compl. ¶ 8.

Martinson began working for Mahube in August 2016. Am. Compl. ¶ 6. She was responsible for overseeing and managing enrollment for Mahube's Head Start program. *Id.* ¶ 7. Martinson alleges that her employment with Mahube was "immediately successful." *Id.* ¶ 10. Martinson alleges, for example, that she received an "overwhelmingly positive" first evaluation from her supervisor, Margaret Aho ("Aho"), "[i]n September 2016." *Id.* Martinson also alleges that she "was promoted out of [a] probationary period" that "usually lasts for six months" in only four months, or two months ahead of schedule. *Id.* ¶ 11. Martinson alleges that she received a second "positive performance review" from Aho in "approximately December 2016." *Id.* ¶ 12.

According to Martinson, her employment relationship with Mahube began to deteriorate "around March 2017." *Id.* ¶ 13. At that time, Martinson alleges, Aho instructed her to enroll applicants in Head Start who "Martinson believed were ineligible for

3

reenrollment under federal law." *Id.* Martinson grounds her belief that these applicants "were ineligible for reenrollment" on a federal regulation governing Head Start, and Martinson identifies and describes the regulation in her complaint. *Id.*; *see id.* ¶¶ 14–16.

Martinson first identifies 45 C.F.R. § 1302.12(c)(1), which she alleges establishes four "needs-based criteria" for Head Start eligibility. *Id.* ¶ 14. Per the regulation (and not Martinson's summary of it in her complaint), a "pregnant woman or a child is eligible" for Head Start if:

> (i) The family's income is equal to or below the poverty line; or,
> (ii) The family is eligible for or, in the absence of child care, would be potentially eligible for public assistance; including TANF child-only payments; or,
> (iii) The child is homeless, as defined in part 1305; or,
> (iv) The child is in foster care.

45 C.F.R. § 1302.12(c)(1). Martinson alleges that any family meeting any one criterion in paragraph (c)(1) is "automatically eligible" for Head Start. Am. Compl. ¶ 14.

Martinson next identifies 45 C.F.R. § 1302.12(c)(2) and (d). *Id.* ¶ 15. These paragraphs of the regulation address Head Start enrollment of participants who do not satisfy any one criterion described in § 1302.12(c)(1). Again, quoting from the regulation itself, § 1302.12(c)(2) provides: "If the family does not meet a criterion under paragraph (c)(1) of this section, a program may enroll a child who would benefit from services, provided that these participants only make up to 10 percent of a program's enrollment in accordance with paragraph (d) of this section." 45 C.F.R. § 1302.12(c)(2). Paragraph (d)(1) goes on to say:

4

> A program may enroll an additional 35 percent of participants whose families do not meet a criterion described in paragraph (c) of this section and whose incomes are below 130 percent of the poverty line, if the program:
>
> > (i) Establishes and implements outreach, and enrollment policies and procedures to ensure it is meeting the needs of eligible pregnant women, children, and children with disabilities, before serving pregnant women or children who do not meet the criteria in paragraph (c) of this section; and,
> >
> > (ii) Establishes criteria that ensure pregnant women and children eligible under the criteria listed in paragraph (c) of this section are served first.

45 C.F.R. § 1302.12(d)(1).

Martinson alleges that she "understood Ms. Aho's request to be unlawful because there were numerous needs-based families that were eligible and on the program's waitlist, but Ms. Aho insisted that Ms. Martinson reenroll students who were above the federal poverty line and who did not meet any of the other need-based [sic] criterion." Am. Compl. ¶ 16. Martinson alleges that complying with Aho's request would have required Martinson to "ignore the regulation requiring that a program ensure that needs-based eligible families are served first," something Martinson "understood to be illegal." *Id.* ¶¶ 16–17. Martinson alleges that she "refused to comply" with Aho's instruction in this respect and that this "created tension and hostility between her and Ms. Aho." *Id.* ¶¶ 18–19.

Due to the tension between her and Aho, Martinson reported her concerns directly to Mahube's executive director, Liz Kuoppala ("Kuoppala"). *Id.* ¶¶ 20–22. Martinson alleges that she "reported what she understood to be illegal conduct" to Kuoppala. *Id.* ¶ 28. As a result of this report, Martinson alleges that Aho began retaliating against her. *Id.* Martinson alleges examples of alleged retaliation in her complaint, including intimidating

5

and hostile conduct and comments, *id.* ¶ 24, an inaccurate and unsubstantiated negative performance review, *id.* ¶ 29, the "stripp[ing] of many of her job duties as well as her management responsibilities," *id.* ¶ 30, not being invited to "management meetings that were necessary to complete her job," *id.* ¶ 32, and the denial of "training opportunities previously afforded to her and approved for other employees," *id.* ¶ 33. Martinson also alleges that Aho ignored her emails and "refused to assist or otherwise work with [her], which was essential for [her] to be successful in her role at [Mahube]." *Id.* ¶¶ 34–35.

Martinson alleges that she next "appealed" to Mahube's human-resources department by filing a grievance. *Id.* ¶ 36. Martinson alleges, however, that she "did not receive a meaningful response regarding her grievance" and that she suffered additional adverse actions. *Id.* ¶ 41; *see id.* ¶¶ 42–46. Martinson alleges that Aho "continued to undermine [her] efforts to enroll children in classes" and eventually caused Martinson "to fail meeting enrollment in the fall of 2017." *Id.* ¶¶ 42–43. Martinson alleges that "she was prohibited from staying at work past 5:00 p.m." and that "[t]his greatly impacted her ability to do her job." *Id.* ¶ 45. Martinson also alleges that she was assigned a new supervisor "who began micromanaging [her] work" even though the supervisor "had no experience in Ms. Martinson's work or role with [Mahube]." *Id.* ¶ 46.

Dissatisfied with the response to her grievance, Martinson "felt she had no choice but to reach out to a member of [Mahube's] Board, Larry Knutson, with whom she was acquainted." *Id.* ¶ 48. Martinson alleges that her report prompted other employees to bring their complaints to the Mahube Board of Directors and that the Board initiated an investigation. *Id.* ¶¶ 51–53. Martinson alleges that, following the initiation of this

6

investigation, she was placed on a mentoring plan. *Id.* ¶ 54. According to Martinson, the mentoring plan "set unreasonable substantive and timeliness expectations" and gave her "little direction . . . about how to be successful under" the plan. *Id.* ¶ 56. Martinson says she refused to sign the mentoring plan, but that Mahube told her it would enforce the plan regardless. *Id.* ¶¶ 57–60. Martinson alleges that the Board's investigation "found no evidence of retaliation against [her]," and that her employment was terminated for poor performance. *Id.* ¶¶ 61–62.

II

A

Remand to state court is proper if the district court lacks subject-matter jurisdiction over the asserted claims. 28 U.S.C. § 1447(c). The burden of establishing federal jurisdiction by a preponderance of the evidence falls on the party who is attempting to invoke the jurisdiction of the federal court. *See Cent. Iowa Power Coop. v. Midwest Indep. Transmission Sys. Operator, Inc.*, 561 F.3d 904, 912 (8th Cir. 2009) (citation omitted). Courts should strictly construe the requirements of removal jurisdiction and remand all cases in which such jurisdiction is doubtful. *Id.* (citation omitted); *see Arnold Crossroads, L.L.C. v. Gander Mountain Co.*, 751 F.3d 935, 940 (8th Cir. 2014) (citation omitted); *Nichols v. Harbor Venture, Inc.*, 284 F.3d 857, 861 (8th Cir. 2002) (citing *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108–09 (1941)). When the plaintiff and defendant clash on the issue of jurisdiction, uncertainties are resolved in favor of remand. *See Knudson v. Sys. Painters, Inc.*, 634 F.3d 968, 975 (8th Cir. 2011) (citation omitted). "A defendant may remove a state claim to federal court only if the action originally could have

been filed there." *Baker v. Martin Marietta Materials, Inc.*, 745 F.3d 919, 923 (8th Cir. 2014) (citation and internal quotation marks omitted). "Removal based on federal question jurisdiction is governed by the well pleaded complaint rule: jurisdiction is established only if a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Id.* (citation and internal quotation marks omitted).

"[I]n certain cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005) (citation omitted). "There is no 'single, precise, all-embracing test for jurisdiction over federal issues embedded in state-law claims between nondiverse parties.'" *Cent. Iowa Power Coop.*, 561 F.3d at 912 (quoting *Grable*, 545 U.S. at 314). "[T]he question is, does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 314. Stated differently, a state-created claim may arise under federal law for purposes of § 1331 "if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258. "This rule applies only to a 'special and small category' of cases that present 'a nearly pure issue of law, one that could be settled once and for all and thereafter would govern numerous . . . cases.'" *Great Lakes Gas Transmission Ltd. P'ship v. Essar Steel Minn. LLC*, 843 F.3d 325, 331 (8th Cir. 2016) (alteration in original) (quoting *Empire Healthchoice*, 547 U.S. at 699–700).

8

B

Start with the substantiality requirement. An issue of federal law is substantial when it is important to the federal system as a whole, not merely when it is "significant to the particular parties in the immediate suit." *Gunn*, 568 U.S. at 260. For a federal interest to be substantial, it must "justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Grable*, 545 U.S. at 312 (citation omitted). A federal issue is more likely to be substantial if "[t]he Government . . . has a direct interest in the availability of a federal forum to vindicate its own administrative action." *Id.* at 315. A substantial federal issue is more likely to be present if a "pure issue of [federal] law" is "dispositive of the case"; "fact-bound and situation-specific" disputes typically do not implicate substantial federal issues. *Empire Healthchoice*, 547 U.S. at 700–01 (citation omitted); *see also Great Lakes*, 843 F.3d at 333. A federal issue is more likely to be substantial if its resolution will control "numerous other cases." *Empire Healthchoice*, 547 U.S. at 700 (citing *Grable*, 545 U.S. at 313). By contrast, if a particular federal issue "does not arise frequently, it is unlikely to implicate substantial federal interests." *Gunn*, 568 U.S. at 262.

Here, the federal issue Martinson describes in her complaint is not substantial in the relevant sense. Though the Head Start enrollment-eligibility regulation Martinson identifies provides the backdrop for her claim, and its interpretation may be significant to the parties, there is no indication that this regulation or any issues related to the regulation are important to the federal system as a whole. No doubt regulatory compliance is a federal interest in the abstract, but that alone cannot be enough to classify a federal issue as

9

substantial. If it were, there would be no need to consider the "direct[ness]" of the Government's interest in the availability of a federal forum, as the Supreme Court did in *Grable*. 545 U.S. at 315. On that point, there is no suggestion that the Government has a direct stake in the Head Start regulation Martinson cites, or that there is (or was) administrative action related to Martinson's reports or Mahube's actions in administering its Head Start program.

Nor does the federal regulation Martinson cites create a "pure issue of law" that will be dispositive of the case. *Empire Healthchoice*, 547 U.S. at 700. Even if the regulation is interpreted as Martinson proposes, important questions of law and fact would remain. These include, as possible examples, the nature and content of Martinson's alleged reports, Mahube's conduct and policies relative to the regulation, and the existence of a causal connection between Martinson's protected conduct and Mahube's alleged adverse employment actions. *See*, *e.g.*, *Schwab v. Altaquip LLC*, No. 14-cv-1731 (PJS/JSM), 2015 WL 5092036, at *3–4 (D. Minn. Aug. 28, 2015) (describing elements of claim under the Minnesota Whistleblower Act). By all appearances, the parties dispute these issues.[1] There also is no question the interpretation and application of the federal regulation Martinson cites will occur in the context of a "fact-bound and situation-specific" dispute.

---

[1] In support of its Fed. R. Civ. P. 12(b)(6) motion to dismiss, Mahube argued that Martinson must allege that she reported conduct which, if true, actually violated the federal Head Start regulation upon which she relies. Def.'s Mem. in Supp. at 1–2, 8–12 [ECF No. 25]. In opposition to Mahube's motion, Martinson argued first that her allegations establish a violation of the law. Pl.'s Mem. in Opp'n at 10–16 [ECF No. 35]. Then, alternatively, Martinson argued that she is not required to report an "actual violation of law." *Id.* at 16-18. Nothing in this opinion should be construed as resolving this issue.

*Empire Healthchoice*, 547 U.S. at 701. Martinson's complaint—from which the facts in Part I of this opinion are almost entirely taken—contains dozens of paragraphs of detailed factual allegations unique to Martinson's claims, and the task of finding facts will be time-consuming and outcome-determinative apart from the task of interpreting the Head Start regulation. In other words, the task of interpreting the regulation is, at most, one step in the adjudication of Martinson's claim, and it alone will not resolve the case.

There is no indication that the resolution of this case will control some meaningful number of other cases. The parties have not identified any other cases that might be affected, and only one case, it seems, addresses an earlier version of the same section of the regulation Martinson cites. *See Action for Bos. Cmty. Dev., Inc. v. Shalala*, 983 F. Supp. 222, 230, 239 (D. Mass. 1997) (citing 45 C.F.R. § 1302.12), *aff'd*, 136 F.3d 29 (1st Cir. 1998). Finally, though it is true that the Head Start program is understood to be important,[2] the specific regulation Martinson relies upon to establish her state-created

---

[2] *See*, *e.g.*, Andres S. Bustamante et al., *Realizing the Promise of High Quality Early Childhood Education*, EDUCATION PLUS DEVELOPMENT (Mar. 27, 2017), https://www.brookings.edu/blog/education-plus-development/2017/03/27/realizing-the-promise-of-high-quality-early-childhood-education/ ("High quality early childhood education sets children on life trajectories of success."); Diane Whitmore Schanzenbach & Lauren Bauer, *The Long-Term Impact of the Head Start Program*, THE BROOKINGS INSTITUTION (Aug. 19, 2016), https://www.brookings.edu/research/the-long-term-impact-of-the-head-start-program/ ("Head Start not only enhances eventual educational attainment, but also has a lasting positive impact on behavioral outcomes including self-control and self-esteem. Furthermore, it improves parenting practices—potentially providing additional benefits to the next generation."); Press Release, Nat'l Head Start Ass'n, Congress Passes $200 Million Increase for Head Start (Sept. 26, 2018), https://www.nhsa.org/pr-update/congress-passes-200-million-increase-head-start (noting that Head Start will receive $10.1 billion in federal funding for fiscal year 2019, which is an increase of $200 million from fiscal year 2018).

claim in this case does not implicate a national interest comparable to the Government's ability to recover delinquent taxes at issue in *Grable*, 545 U.S. at 315, or the constitutional validity of the Government's bond issuance in *Smith v. Kansas City Title & Tr. Co.*, 255 U.S. 180, 201 (1921).

C

Even if a state-created claim includes a contested and substantial federal issue, the exercise of federal jurisdiction is not absolute; the federal issue will "qualify for a federal forum only if federal jurisdiction is consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331." *Grable*, 545 U.S. at 313–14; *see also id.* at 315 (noting that "because it will be the rare state title case that raises a contested matter of federal law, federal jurisdiction to resolve genuine disagreement over federal tax title provisions will portend only a microscopic effect on the federal-state division of labor"). Analyzing this factor includes, among other things, considering the practical consequences to the federal courts' caseload likely to result from accepting jurisdiction over this case and others like it. As the Supreme Court explained in *Grable*, summarizing the rationale underlying its earlier decision in *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804 (1986):

> One only needed to consider the treatment of federal violations generally in garden variety state tort law. "The violation of federal statutes and regulations is commonly given negligence per se effect in state tort proceedings." . . . . A general rule of exercising federal jurisdiction over state claims resting on federal mislabeling and other statutory violations would thus have heralded a potentially enormous shift of traditionally state cases into federal courts. Expressing concern over the "increased volume of federal litigation," and noting the

> importance of adhering to "legislative intent," *Merrell Dow* thought it improbable that the Congress, having made no provision for a federal cause of action, would have meant to welcome any state-law tort case implicating federal law "solely because the violation of the federal statute is said to [create] a rebuttable presumption [of negligence] . . . under state law."

*Grable*, 545 U.S. at 318–19 (alterations in original) (citations and footnote omitted).

Essentially the same has been said of employment litigation:

> Employment litigation is a common occurrence in both federal and state courts. Federal legislation has provided access to the federal courts by aggrieved employees under specifically delineated circumstances, *e.g.*, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*; Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*; Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*, but our perception is that the bulk of the judicial business in the United States in this area is conducted by the state courts. This balance would be upset drastically if state public policy claims could be converted into federal actions by the simple expedient of referencing federal law as the source of that public policy. We believe such a dramatic shift would distort the division of judicial labor assumed by Congress under section 1331.

*Eastman v. Marine Mech. Corp.*, 438 F.3d 544, 553 (6th Cir. 2006). For this reason, among others, federal courts have found subject-matter jurisdiction lacking over state-created whistleblower-type employment claims with an embedded federal issue. *See, e.g.*, *Garcia v. Merchants Bank of Cal., N.A.*, No. 2:17-CV-04791-ODW-SK, 2017 WL 4150870, at *2–3 (C.D. Cal. Sept. 19, 2017) (analyzing a whistleblower-retaliation claim under Cal. Labor Code § 1102.5); *Bonnafant v. Chico's FAS, Inc.*, 17 F. Supp. 3d 1196, 1203 (M.D. Fla. 2014) (analyzing a claim under Florida Whistleblower Act); *Meyer v. Health Management Associates, Inc.*, 841 F. Supp. 2d 1262, 1272 (S.D. Fla. 2012) (same).

These considerations lead here to the conclusion that there is not subject-matter jurisdiction over Martinson's claim because it would be inconsistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331. The Minnesota Whistleblower Act prohibits an employer from taking adverse action against an employee because the employee "in good faith, reports a violation, suspected violation, or planned violation of any federal or state law or common law or rule adopted pursuant to law to any employer or to any governmental body or law enforcement official." Minn. Stat. § 181.932, subd. 1(1). The statute's inclusion of federal law as the basis for a protected report is not unusual among similar state statutes[3] and implicates a great number of possible state-law claims with embedded federal issues. Countless individuals work in occupations, or for employers, subject to federal regulation. And it certainly seems as if finding subject-matter jurisdiction in this Minnesota Whistleblower Act case based on the presence of an asserted violation of the federal regulation Martinson identifies would—if followed in other cases—risk tilting the balance of employment-law litigation toward the federal courts in a way that is at odds with § 1331. If an asserted violation of Head Start regulations was sufficient to confer subject-matter jurisdiction, then it would seem many other categories of regulations and statutes governing all manner of commercial activities might suffice. There would be no obvious limiting

---

[3] *See, e.g.*, Cal. Labor Code § 1102.5; D.C. Code § 1-615.52–.53; 740 Ill. Comp. Stat. 174/15; N.D. Cent. Code § 34-01-20; Ohio Rev. Code Ann. § 4113.52; *see also* Miriam A. Cherry, *Whistling in the Dark? Corporate Fraud, Whistleblowers, and the Implications of the Sarbanes-Oxley Act for Employment Law*, 79 WASH. L. REV. 1029, 1087–1120 (2004) (summarizing whistleblower-protection statutes in all fifty states).

principle. If a Head Start regulation is sufficient, then why not a regulation governing air travel? Or the manufacture of medical devices? The list would be very long.

In addition to the potential for an "enormous shift" of traditionally state cases into the federal courts, *Grable*, 545 U.S. at 319, finding jurisdiction in the circumstances of this case effectively would cede significant power to states to define the expanse of federal subject-matter jurisdiction. As the Supreme Court alluded to in *Grable*, though tort, contract, and employment claims are typically created by state law, state laws governing these claims often permit a violation of federal law to meet an element of the claim—a federal violation may have a negligence-per-se effect in a state tort case; federal law may establish a contract term; or, as here, reporting a federal violation may be protected activity under a state whistleblower statute. *See id.* at 318–19. Permitting federal jurisdiction in such cases effectively would permit states to expand federal-court power through the adoption of such laws, and that would be problematic for many reasons.

D

Because Martinson's claim is neither substantial in the relevant sense nor capable of resolution in federal court without disrupting the federal-state balance approved by Congress, it is unnecessary to determine whether her claim necessarily raises a federal issue that is actually disputed by the parties.

**ORDER**

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff Nicole Martinson's Motion to Remand to State Court [ECF No. 15] is **GRANTED**;

2. This action is **REMANDED** to the Becker County District Court, Seventh Judicial District, State of Minnesota; and

3. Defendant Mahube-Otwa Community Action Partnership, Inc.'s Motion to Dismiss the First Amended Complaint [ECF No. 23] is **DENIED AS MOOT**.

Dated: March 11, 2019   s/ Eric C. Tostrud
　　　　　　　　　　　　　　　　Eric C. Tostrud
　　　　　　　　　　　　　　　　United States District Court